Lawrence M. Rolnick
Marc B. Kramer
Thomas E. Redburn, Jr.
Sheila A. Sadighi
Michael J. Hampson
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, NJ  07068
Tel. 973.597.2500
Fax  973.597.2400
lrolnick@lowenstein.com
mkramer@lowenstein.com
tredburn@lowenstein.com
ssadighi@lowenstein.com
mhampson@lowenstein.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MSD TORCHLIGHT PARTNERS, L.P. and MSD TORCHLIGHT PARTNERS (MM), L.P.**,**<br><br>Plaintiffs,<br><br>v.<br><br>VALEANT PHARMACEUTICALS INTERNATIONAL, INC., J. MICHAEL PEARSON, and HOWARD B. SCHILLER,<br><br>Defendants. | Civil Case No. _____<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE OF THE ACTION ..................................................................................................2

JURISDICTION AND VENUE ...........................................................................................5

PARTIES ..............................................................................................................................5

    I.     Plaintiffs ...............................................................................................................5

    II.    Defendants ...........................................................................................................6

FRAUD-BASED CLAIMS ..................................................................................................7

    I.     FACTUAL ALLEGATIONS ...............................................................................7

        A.    Overview of the Pharmaceutical Industry.............................................7

        B.    Valeant's Business Model......................................................................8

        C.    Valeant's Reporting Obligations as a Public Company.........................9

        D.    Valeant's Web of Deception .................................................................12

        E.    The Truth Gradually Emerges and the Prices of Valeant's Securities Plummet ...............................................................................................23

    II.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .......................................................................................................32

        A.    Misrepresentations and Omissions about Valeant's Ties to Philidor ...................32

        B.    Misrepresentations Concerning the Reason for Valeant's Steep Revenue Growth ...................................................................................39

    III.   SUMMARY OF DEFENDANTS' SCIENTER .....................................................42

    IV.   PRESUMPTION OF RELIANCE........................................................................46

    V.    LOSS CAUSATION..............................................................................................47

    VI.   NO SAFE HARBOR ............................................................................................48

    VII.  FRAUD-BASED CAUSES OF ACTION ...........................................................49

NEGLIGENCE-BASED CLAIMS .............................................................................................. 54

    I.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................................................................................ 54

    II.     SUMMARY OF DEFENDANTS' NEGLIGENCE .................................... 58

    III.    PLAINTIFFS' ACTUAL RELIANCE ...................................................... 58

    IV.    LOSS CAUSATION ................................................................................. 59

    V.     NO SAFE HARBOR ................................................................................ 60

    VI.    NEGLIGENCE-BASED CAUSES OF ACTION ...................................... 61

PRAYER FOR RELIEF ......................................................................................................... 64

JURY DEMAND .................................................................................................................... 64

Plaintiffs MSD Torchlight Partners, L.P. and MSD Torchlight Partners (MM), L.P. (collectively, "Plaintiffs") through their undersigned attorneys, by way of this Complaint and Jury Demand, for their federal securities claims against Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), J. Michael Pearson ("Pearson"), and Howard B. Schiller ("Schiller" and, collectively with Valeant and Pearson, "Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

Plaintiffs' information and belief is based on, among other things, an investigation by their attorneys, which investigation includes a review and analysis of:  Valeant's public filings with the United States Securities and Exchange Commission ("SEC"); Valeant conference and earnings call transcripts; investor presentations drafted by Valeant; press releases and public statements issued by Valeant and its representatives; congressional testimony of Pearson and Schiller; documents produced to congressional committees by Valeant; court filings concerning Philidor RX Services, LLC ("Philidor") and R&O Pharmacy ("R&O"); analyst reports concerning Valeant; media reports concerning Valeant; and publicly available data relating to the prices and trading volumes of Valeant securities.

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

---

[1] L. Civ. R. 10.1 Statement:  Plaintiffs are investment funds whose investment adviser has its principal place of business at 645 Fifth Avenue, New York, NY 10022; Defendant Valeant has its U.S. headquarters at 400 Somerset Corporate Blvd., Bridgewater NJ 08807; Defendant Pearson's address is 18 Tuttle Ave., Spring Lake, NJ 07762; and Defendant Schiller's address is 40 Montview Ave., Short Hills, NJ 07078.

## NATURE OF THE ACTION

1.      This is an action to recover significant investment losses suffered as a result of the unprecedented meltdown of a $90 billion drug company.  Valeant is a pharmaceutical company based in Bridgewater, New Jersey, that develops, manufactures and markets prescription drugs, over-the-counter products, and medical devices.  Unbeknownst to Plaintiffs and the rest of the market, between 2013 and 2015, Defendants Valeant, Pearson and Schiller made material misrepresentations and failed to disclose material facts in order to:  (a) conceal the existence of a network of specialty pharmacies whose sole purpose was to steer patients toward Valeant products even when much cheaper generic alternatives were available; and (b) mislead investors that Valeant's growth derived from organic volume increases when, in fact, such growth was driven primarily by Valeant's unsustainable practice of acquiring medications and drastically increasing their prices.  As the truth was gradually revealed to the market, the price of Valeant securities plummeted from over $250 per share in mid-2015 to under $25 per share by the time the fraud was fully revealed in mid-2016.

2.      Until October 19, 2015, Defendants improperly concealed the existence of and Valeant's relationship with Philidor, a specialty pharmacy whose only client was Valeant, and which generated significant revenues for Valeant by using a network of purportedly independent pharmacies to dispense Valeant drugs over cheaper generic equivalents.

3.      Despite having a long and deep relationship with Philidor, Valeant went to great lengths to conceal its ties to Philidor.  Valeant employees were heavily involved in the formation of Philidor in January 2013, but used aliases to conceal their involvement.  Valeant was Philidor's only pharmaceutical company client, but Philidor used a network of differently-named pharmacies in several states to keep other industry participants from learning about Philidor's connection to Valeant.  Philidor also required its employees to enter into confidentiality

-2-

agreements.  Valeant exercised various forms of control over Philidor's operations and senior personnel.  In December 2014, Valeant obtained an option to acquire 100% of Philidor for $0, after which Valeant began consolidating Philidor's financial results with its own (but did not identify Philidor to investors as a consolidated entity).

4.      Although Philidor effectively operated as a division of Valeant, Defendants hid Philidor's existence and Valeant's ties to Philidor.  Their reason for doing so was the serious regulatory and reimbursement risks that would materialize if other participants in the industry knew of Valeant's relationship with Philidor.  Had they known about the connection between Valeant and Philidor, large pharmacy benefit managers would have scrutinized and denied reimbursement requests from Philidor because of the likelihood that the specialty pharmacy was just a shill for one of the large pharmaceutical manufacturers.  This was subsequently confirmed when the three largest pharmacy benefit managers dropped Philidor from their programs after Philidor's relationship with Valeant was revealed in late 2015.  Despite trumpeting its "alternate fulfillment" distribution channel to investors, Valeant concealed that it consisted of a captive pharmacy that third-party payors would reject.

5.      Under generally accepted accounting principles, Valeant was required to provide certain information about Philidor (including, among other things, Philidor's nature, size, purpose, activities, and how it was financed) in its financial statements.  Valeant's management also was required to disclose Philidor as a separate sales channel in its quarterly discussion of Valeant's operating results.  Defendants' failure to do so rendered Valeant's public filings with the SEC materially false, misleading, and incomplete.

6.      In addition to concealing Philidor, Defendants misled investors about the drivers of Valeant's rapid growth.  Between 2011 and 2015, Valeant experienced significant revenue

growth.  As Valeant's rapid rise came under increasing scrutiny, Valeant repeatedly stressed to investors that it was mostly the result of organic volume growth, and not because of Valeant raising prices on newly acquired drugs.  As late as October 14, 2015, Valeant publicly represented that "**volume growth contributes significantly more than price**" to its business.[2] This mattered to investors because volume-based growth implies more sustainable long-term cash flows than short-term price increases.

7.     However, Valeant's representations about its "organic growth" were materially false and misleading.  As would later be revealed, Valeant's steep growth was fueled by acquiring existing medications from other drug companies and then drastically increasing the prices on those drugs.  Defendants were well aware of the real drivers behind Valeant's growth. Indeed, after one occasion where Pearson told investors that growth was based on volume and not price, he received an email from Defendant Schiller, Valeant's CFO, reminding him that price increases actually accounted for 80% of Valeant's growth.

8.     The effect of Defendants' misrepresentations about the existence of Philidor and Valeant's growth was to artificially inflate the price of Valeant's securities.

9.     Plaintiffs are investment funds that purchased Valeant common stock between February 27, 2015 and October 5, 2015, during the time when Defendants, unbeknownst to Plaintiffs, were concealing Valeant's connection to Philidor and making misleading statements about Valeant's growth.  As the truth was gradually disclosed and processed by the market, thereby causing Valeant's stock price to decline, Plaintiffs suffered significant losses.

---

[2] Unless otherwise noted, emphasis in quotations has been added.

10.     Plaintiffs therefore bring this action under the federal securities laws and under the common law to recover damages for the investment losses they suffered as a result of Defendants' materially false and misleading misstatements and omissions of material fact.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under state common law.

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

14.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## PARTIES

**I.      Plaintiffs**

15.     Plaintiff MSD Torchlight Partners, L.P. is a Delaware limited partnership with its main office location in New York, New York.  A list of the dates on which it purchased Valeant common stock in the United States during the relevant period is attached hereto as Exhibit A.

16.     Plaintiff MSD Torchlight Partners (MM), L.P. is a Delaware limited partnership with its main office location in New York, New York.  A list of the dates on which it purchased Valeant common stock in the United States during the relevant period is attached hereto as Exhibit B.

17.     At all relevant times, MSD Partners, L.P. ("MSD Partners") acted as investment adviser to Plaintiffs in connection with their purchases of Valeant securities.

**II.     Defendants**

18.     Defendant Valeant is a Canadian corporation with its U.S. headquarters in Bridgewater, New Jersey.   Valeant is a multinational pharmaceutical and medical device company with approximately 22,000 employees.  Valeant develops, manufactures and markets a broad range of brand-name and generic pharmaceuticals, over-the-counter ("OTC") products and medical devices, which are marketed directly or indirectly in more than 100 countries.  Valeant's common stock is publicly traded in the United States on the New York Stock Exchange ("NYSE") under the ticker symbol "VRX."

19.     Defendant Pearson was Valeant's CEO during most of the relevant time period. Pearson joined Valeant in 2008.  When Valeant's troubles began to spiral out of control in late 2015, Pearson took a leave of absence for medical reasons.  In March 2016, Valeant announced that Pearson would be replaced as CEO.  In addition to being CEO of Valeant, Pearson served on Valeant's Board of Directors, including as Chairman from March 2011 to January 2016.

20.     Defendant Schiller was Valeant's CFO during most of the relevant time period, and also served as interim CEO during Pearson's leave of absence.  Schiller resigned as CFO on June 30, 2015, but retained his position on Valeant's Board of Directors, which he held from September 2012 until June 2016.  Schiller had a long career in investment banking prior to joining Valeant.

## FRAUD-BASED CLAIMS

## I.     FACTUAL ALLEGATIONS

### A.      Overview of the Pharmaceutical Industry

21.    The global pharmaceutical industry is one of the largest markets in the world. The value of the U.S. pharmaceutical market alone is estimated to reach well over half a trillion dollars by 2020.

22.    The traditional business model for how pharmaceutical companies generate revenue is relatively straightforward.  Drug companies develop new medications that, once approved by the Food and Drug Administration ("FDA"), are patented and marketed to the medical profession and consumers; medical professionals prescribe those drugs to patients; patients take the prescription to a pharmacy to be filled; and the pharmacist dispenses the medication to the patient, with the patient paying a co-pay and the patient's insurer paying the remaining amount for the medication.

23.    In the modern pharmaceutical industry, pharmacy benefit managers, or "PBMs," play a significant role.  PBMs are third-party administrators retained by prescription drug plans that, according to the American Pharmacists Association, "are primarily responsible for developing and maintaining the formulary, contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims." PBMs create pharmacy networks, pursuant to which only approved pharmacies can dispense drugs under plans that the PBMs administer.  The three largest PBMs – ExpressScripts, CVS Caremark, and OptumRx – control approximately of 80% of the PBM market in the U.S.

24.    For many pharmaceutical manufacturers, the time during which their brand-name products face no generic competition is an extremely important period.  When a brand-name drug is first approved by the FDA, there is a period of exclusivity that allows the drug

manufacturer to set the price so that it can first recoup its expenses and then generate a profit. Once generic equivalents of the brand-name drug enter the market, however, the brand-name drug loses its competitive advantage. Indeed, it is not unusual for a pharmacist to automatically substitute an available generic equivalent for a brand-name prescription because of the lower price of the generic drug.

25. One of the faster growing areas in the pharmaceutical industry is the rise of "specialty pharmacies" to dispense specialty drugs. Specialty drugs are typically prescribed to treat chronic diseases (such as cancer, HIV, and multiple sclerosis), are high-cost, and can be difficult to administer. Traditional retail pharmacies are not well-equipped to provide the individual attention that patients require to determine the cheapest way to obtain specialty drugs and to administer the medication. Legitimate specialty pharmacies provide the necessary services to help patients obtain and administer specialty drugs.

### B. Valeant's Business Model

26. Valeant was founded as a pharmaceutical company in California in 1960 by Milan Panic, a former Olympic cyclist who later became prime minister of Yugoslavia. Originally called ICN Pharmaceuticals, the Company changed its name to Valeant in 2003.

27. In 2008, one of Valeant's largest investors – ValueAct – brought Defendant Pearson on board as Valeant's CEO. Pearson did not have a medical background, but rather had spent twenty-three years at McKinsey, a management consulting firm. Pearson's business background shaped the direction in which he steered Valeant.

28. Pearson pursued a business model for Valeant that was different from other pharmaceutical manufacturers. Traditionally, pharmaceutical companies invest significant capital in the research and development ("R&D") of new drugs. However, the pharmaceutical R&D process can be inefficient, costly and time-consuming. Therefore, Pearson advocated for a

strategy of spending less on R&D, and instead acquiring other drug companies that had already-developed products.  According to a recent *Vanity Fair* article, Pearson's motto was, "Don't bet on science – bet on management."

29.     Pearson followed a hands-on approach to his management of Valeant.  According to an article in *Bloomberg Businessweek* that quoted Valeant employees who worked for Pearson, "he had his fingers in everything, from operations to making decisions about the salaries of individual employees."

30.     Valeant experienced tremendous growth.  The Company made over 100 acquisitions between 2008 and 2015.  In 2011 and 2012, Valeant built a significant position in dermatology by acquiring companies such as Medicis Pharmaceutical Corp. ("Medicis"), Obagi Medical Products ("Obagi"), Dermik, and Ortho Dermatologics.  In 2013, Valeant became a large player in the ophthalmology market when it acquired Bausch & Lomb.

31.     Valeant also cut costs with Pearson at its helm.  Pearson slashed Valeant's investment in R&D of new drugs.  Then, in 2010, Valeant reduced its tax rate to the lowest of any pharmaceutical company in the world by merging with a Canadian company, Biovail, which operated through offshore subsidiaries in tax friendly jurisdictions.

32.     Between 2008 and 2015, Valeant's stock priced soared, rising from around $10 per share to over $250 per share.  As explained below, much of this stock price growth was caused by Defendants' material misrepresentations and omissions.

### C.      Valeant's Reporting Obligations as a Public Company

33.     Under the federal securities laws and the regulations and guidance promulgated by the SEC pursuant to those laws, companies whose stock is publicly traded in the U.S. – such as Valeant – have important reporting and disclosure obligations.  These requirements were

created by the government to restore investor confidence in the integrity of the U.S. capital markets in the wake of the Great Depression.

34.    Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and their financial condition.   Investors rely on the accuracy and transparency of these disclosures when determining whether to invest.

35.    As a publicly traded corporation with significant operations in the U.S., Valeant is required to prepare its financial statements in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP") in order for those financial statements not to be deemed misleading and inaccurate.  U.S. GAAP is a set of rules and standards that are designed to ensure uniform financial reporting.

36.    One of those standards is ASB Accounting Standards Codification Topic 810, Consolidation ("ASC 810").   Among other things, ASC 810 sets forth rules governing the disclosure by public companies in their financial statements of "variable interest entities" or "VIEs."  Loosely defined, a VIE is an entity in which the reporting company has a controlling interest.   A VIE of which the reporting company is the "primary beneficiary" must be consolidated in the reporting company's financial statements.   ASC 810 requires that certain information about both consolidated and unconsolidated VIEs be disclosed in an issuer's financial statements.

37.    In addition to complying with U.S. GAAP, public companies are required to follow the standards developed by the SEC governing what information must be disclosed in financial statements and other public filings.  For example, with respect to assessing materiality in preparing financial statements, the SEC has released Staff Accounting Bulletin No. 99 ("SAB

99"), which emphasizes the importance of qualitative factors in determining materiality.  In SAB 99, the SEC stated that while it had no objection to using a numerical threshold of 5% as a starting point in assessing materiality, "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations."  Thus, for example, a quantitative misstatement of revenue under 5% might be deemed material if "the misstatement hides a failure to meet analysts' consensus expectations."

38.     Certain SEC filings – such as the issuer's annual report – are required to contain a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&A").  The purpose of the MD&A is to give investors an opportunity to see the issuer's past results and future prospects through the eyes of management.  *See* 17 C.F.R. § 229.303.   According to Topic 13 of the SEC Staff Accounting Bulletin Series ("SAB Topic 13"):

> [The] MD&A requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.   This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.  Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease.

SAB Topic 13 further provides that the types of revenue transactions or events that should be disclosed in the MD&A include, among other things, "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."

39.     As explained in greater detail below, throughout the relevant period Valeant represented to investors that it was complying with these important public reporting obligations by timely disclosing truthful material facts about its business.   However, unbeknownst to the market, Valeant was making misrepresentations about its illicit use of a secret network of pharmacies and its growth, which – when the truth was slowly revealed to the outside world – caused a precipitous decline in the value of Valeant securities.

D.     **Valeant's Web of Deception**

1.     **Valeant's Clandestine Specialty Pharmacy Network**

40.     In September 2012, Valeant announced that it was acquiring Medicis for a price of $2.6 billion.   Medicis was a dermatological and aesthetic pharmaceutical products company that manufactured, among other things, the acne treatment drugs Solodyn and Ziana.

41.     A new business model that Medicis had been exploring prior to its acquisition by Valeant was an "alternate fulfillment" or "AF" initiative.   Under that program, rather than wait for insurance approval to dispense Solodyn and Ziana to a patient, Medicis would dispense the medication and assume the risk that the insurer would refuse to pay.

42.     When Valeant acquired Medicis, it decided to expand the AF intiative.   Pearson told investors that the AF initiative was complex, had several "stages" or "phases," but that Valeant was developing some "exciting opportunities" by expanding the alternate fulfillment initiative.   However, Defendants refused to provide specifics about what those developments were.

43.     Unbeknownst to investors, Valeant's expansion of the AF initiative involved creating a captive, specialty pharmacy whose only client was Valeant but whose success was based on the outside world having no knowledge of Valeant's connection to that pharmacy.   This pharmacy was named "Philidor."

44.      Philidor was an illegitimate sales channel that Valeant created to peddle numerous Valeant products.  Valeant's ability to increase the sales of its drugs through Philidor had the effect of materially boosting Valeant's revenues.  However, in order to do so Valeant had to conceal its ties to Philidor.  Had the third-party payors who reimbursed Valeant known that Philidor was effectively operating as a division of Valeant, they would not have paid for the Valeant drugs Philidor was dispensing.

45.      Philidor was founded in January 2013, purportedly as an independent specialty mail-order pharmacy designed to fill, ship and obtain insurance approval for dermatological medicines.  Philidor was licensed in 45 states and the District of Columbia.  Its network of pharmacies included locations in California, Florida, New Jersey, South Carolina and Texas.

46.      Valeant used its own employees to launch Philidor.  Valeant hired Gary Tanner to act as its liaison with Philidor prior to Philidor even being incorporated.  Tanner traveled frequently between Philidor's offices and Valeant's offices.  According to a former Philidor employee, Tanner oversaw all Valeant employees who were sent to work at Philidor.

47.      Just one day after Philidor was incorporated, Valeant hired Laizer Kornwasser to act as Tanner's supervisor.  Kornwasser reported directly to Defendant Pearson.

48.      After having set up Philidor, Valeant employees were then used to develop Philidor's business of selling Valeant products.

49.      To conceal Valeant's connection to Philidor, Valeant employees used fake names on their Philidor email accounts.  A Valeant manager who worked at Philidor's Phoenix, Arizona office used the alias "Peter Parker" – the alter ego of Spiderman.  Another Valeant employee masqueraded under the name "Jack Reacher," a fictional character played by Tom Cruise in a

2012 movie of the same name.  Yet another Valeant employee – apparently a fan of the Beach Boys – used the name "Brian Wilson" to conceal his identity.

50.     At Valeant's direction, Philidor representatives steered patients toward Valeant's medications and away from less expensive alternatives and generics.  Philidor provided patients who were prescribed Valeant medications coupons to reduce the cost of the drug to the patient.  Philidor would then ship the Valeant drugs to the patient prior to obtaining insurance approval.  If the insurers questioned why doctors prescribed Valeant drugs instead of more affordable alternatives, Philidor representatives intervened.  Philidor was paid a per prescription service fee for its work in implementing Valeant's alternate fulfillment program.

51.     As Philidor's business of distributing only Valeant medications grew, Valeant decided to purchase Philidor to further cement its ties to Philidor's network of pharmacies operating throughout the U.S. solely for the benefit of Valeant.

52.     However, Valeant needed to do so in a way that would not reveal its ties to Philidor to the outside world.  Accordingly, Valeant agreed to pay significant amounts to acquire Philidor, but structured the transaction in a way so that it did not disclose it as an acquisition.

53.     Specifically, in December 2014, Valeant entered into a purchase option agreement with Philidor, agreeing to pay Philidor $100 million for a ten-year option to purchase Philidor for $0.  Valeant also agreed to make additional payments to Philidor upon the attainment of various milestones.

54.     Management and the board of directors of Valeant toured Philidor's facilities prior to executing the purchase agreement in December 2014.  Valeant's management then made the decision to enter into the transaction and how to account for it.

55.     As a result of this transaction, Valeant created a joint steering committee to directly control Philidor.  The joint steering committee was composed of members from Valeant and Philidor.

56.     Valeant also obtained the right to control who Philidor hired for certain positions (including an advisor to the CEO, the head compliance officer, an in-house lawyer, and a head IT officer), and received the right to obtain certain information from Philidor (including the ability to access Philidor's books, records and facilities).

57.     In the purchase option agreement, Philidor covenanted to Valeant that it would comply with all applicable laws, and agreed to indemnify Valeant against third-party claims relating to Philidor's business practices.

58.     Although Philidor effectively operated as a division of Valeant, Valeant took deliberate measures to conceal the relationship from PBMs, insurers, and medical professionals.

59.     Rather than operating throughout the United States under Philidor's name, Valeant and Philidor created a network of pharmacies with different names.  These pharmacies were designed to obscure Valeant's close ties to Philidor and to avoid scrutiny from the PBMs by creating the appearance that many separate, independent pharmacies were distributing Valeant medications.

60.     Philidor also required its employees to sign confidentiality agreements so that, according to *Reuters*, Philidor could "sue workers who divulged information about its activities."

61.     As Philidor's covert network of pharmacies to exclusively distribute Valeant products expanded, Philidor's sales accounted for more and more of Valeant's revenues.  By the time that Valeant began disclosing its relationship with Philidor at the end of October 2015,

Philidor accounted for at least 5.9% of Valeant's year-to-date net revenue.  For the third quarter of 2015 alone, Philidor accounted for at least 6.8% of Valeant's total revenues.

62.     Valeant does not dispute that it considered Philidor to be a VIE for accounting purposes from 2013 on.  However, it improperly failed to disclose Philidor in its annual reports for 2013 and 2014, in each of its quarterly reports in 2013 and 2014, and the first two quarterly reports of 2015.

63.     Valeant's failure to disclose Philidor rendered its affirmative statements about its alternate fulfillment program materially misleading and incomplete.  In 2014, at various investor conferences, Pearson made references to improvements that it was making to its alternate fulfillment program.  However, Pearson failed to disclose that its approach to that program could subject Valeant to serious regulatory and reimbursement risks because of the way Valeant was covertly utilizing Philidor to increase sales of Valeant products.

64.     Moreover, under SAB Topic 13, as discussed in more detail below, Valeant had an obligation to disclose Philidor as a distinct sales channel in the MD&A portion of its periodic reports between 2013 and 2015.

65.     The fact that Valeant considered Philidor to be a VIE required Defendants to disclose certain information about Philidor in Valeant's financial statements pursuant to ASC 810, including: (a) Philidor's nature, size, purpose, activities, and how it was financed; and (b) the methodology for concluding that Valeant was not required to consolidate Philidor's financial statements with its own.  In its 2013 10-K, Valeant misrepresented to the market that: "There were no material arrangements determined to be variable interest entities."

66.     Once Valeant consolidated Philidor's financial statements in 2014 because it determined that Philidor was a VIE of which Valeant was the primary beneficiary, Valeant was

additionally required under ASC 810 to disclose the factors that resulted in the consolidation – *i.e.*, the purchase option agreement with Philidor. However, it failed to do so, simply (and falsely) stating in its 2014 10-K that: "The consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ("VIEs") for which the Company is the primary beneficiary" and "[d]uring the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate."

67. There can be no dispute that Defendants knew about the existence of Philidor and Valeant's relationship to Philidor at the same time they hid their existence from investors and other pharmaceutical industry players. Indeed, the Company has conceded as much, stating that it did not disclose Philidor because it wanted to maintain a "competitive advantage." However, the fact that a company wishes to maintain a competitive advantage does not relieve it from its obligations to comply with U.S. GAAP and the SEC's disclosure requirements and to avoid misleading its investors.

68. In an October 26, 2015 investor presentation, Valeant told investors that, although it considered Philidor to be a VIE, it was not required to disclose Philidor in its financial reports because it did not consider Philidor to be a material part of its business. Specifically, Valeant argued that U.S. GAAP required sales to "customers" to be disclosed only if such sales accounted for more than 10% of Valeant's revenues.

69. Valeant's claim that Philidor was not material to its business is insupportable. As an initial matter, Valeant stated in its October 26, 2015 presentation on Philidor that the specialty pharmacy accounted for "7% or less of consolidated net revenues since Q4 2014." Given that Valeant's revenue losses following Philidor's closure in late 2015 were far greater than 7%, this

was an understatement.  Thus, Philidor met the 5% quantitative materiality standard under SAB 99.

70.   Valeant's argument that Philidor was not quantitatively material because it did not meet Valeant's 10% threshold for customer sales is completely misplaced.  Philidor was not a "customer" of Valeant; rather, it effectively operated as a division of Valeant.  Valeant should have consolidated Philidor prior to December 2014 because Valeant was the primary beneficiary of Philidor.  *See* ASC 810.  In any event, once Valeant consolidated Philidor in December 2014, it could not possibly claim that Philidor was a customer because Philidor was an arm of Valeant.

71.   Moreover, even if not *quantitatively* material, both before and after consolidation Philidor was still *qualitatively* material to Valeant and its investors because of the risks that Valeant's relationship with Philidor posed to the Company.  *See* SAB 99.  The concealment of Valeant's relationship with Philidor was essential to Valeant being able to channel sales through Philidor.  So long as the PBMs had no idea about the connection between Philidor and Valeant, they had no reason to suspect any collusion.

72.   That Philidor's ties to Valeant were qualitatively material to Valeant's business is confirmed by the fact that the three major PBMs dropped Philidor from their networks – which was a death-knell for Philidor – when they found out about Valeant's deceptive use of Philidor to move Valeant products.

### 2.     The Myth of Valeant's Purported "Organic" Growth

73.   Between January 1, 2012, and September 30, 2015, Valeant experienced significant revenue growth.

74.   Specifically, in 2012, Valeant recorded $3.48 billion of revenue; in 2013, Valeant recorded $5.76 billion of revenue; in 2014, Valeant recorded $8.25 billion of revenue; and in the first three quarters of 2015, Valeant recorded annualized revenues of $10.28 billion.

-18-

75.     Valeant represented to investors that the main driver of this growth was organic volume increases in drug sales, and not price hikes on the medications themselves.

76.     Whether Valeant's steep growth was driven by volume instead of price increases was highly material to investors.  The problem with price increases is that they constitute the corporate equivalent of a sugar rush.  The price increase gives the company a large, short-term bump in revenue.  But that revenue bump soon runs its course.  Because there is a market-imposed limit to how often, and by how much, the price of a particular drug can be increased, price increases generally cannot sustain robust, long-term growth.

77.     To achieve sustained growth, the Company needed a program to increase demand for its current products (thereby leading to higher sales volumes), as well as a development or acquisition pipeline to introduce new products.

78.     Thus, for investors focused on long-term cash flows and growth, it mattered whether Valeant's reported revenue increases were the product of short-term price hikes or organic sales volume increases.  A company that obfuscates or lies about its real growth-drivers misleads investors about its current financial health and long-term prospects.

79.      In early 2014, Valeant made a hostile takeover bid for Allergan, Inc. ("Alllergan").  In an attempt to ward off the takeover bid, Allergan told its shareholders that it had "serious concerns about the sustainability of Valeant's business model."  Specifically, Allergan accused Valeant of, among other things, "low organic growth (driven mostly by price increases)."

80.     In response to Allergan's accusations, on May 28, 2014, Valeant held an investor meeting and conference call.  During that call, Pearson denied Allergan's accusations and told

investors that Valeant had "delivered strong organic growth," and that its ability to increase prices in certain sectors was actually restricted.

81.     That same day, Pearson participated in a conference in which he further expounded that Valeant "focus[es] on volume growth, and *the vast majority of our growth on a global basis* – and we went through some of that this morning – *is volume*."

82.     On June 17, 2014, Pearson and Schiller hosted a conference call to further address Allergan's accusations, during which Pearson told investors that "*volume is a much larger piece of our organic growth* than most people would assume it is."

83.     Throughout 2014 and into 2015, Valeant continued to tout its significant "organic growth" as a result of volume increases.  Of particular note, on April 29, 2015, Pearson and Schiller hosted a conference call in connection with the release of Valeant's first quarter financial results.  During the call, one analyst asked Pearson to quantify how price and volume contributed to Valeant's first quarter growth.  Pearson responded:

> In terms of price volume, *actually volume was greater than price in terms of our growth*.  Outside the United States *it's all volume* . . . .  And in the United States *it's shifting more to volume than price*, and we expect that to continue.  A lot of our prices for most of our products are negotiated with managed care.  And *there's only a limited amount of price we can take* . . . *So it's primarily volume*.

84.     In September 2015, as public scrutiny of Valeant's practices was increasing, Pearson wrote a letter to Valeant's employees.  In that letter – which was publicly filed by Valeant with the SEC – Pearson boldly stated that "*Valeant is well-positioned for strong organic growth, even assuming little to no price increases*," and that "Valeant's core operating principles include a focus on volume growth."

85.     As Pearson and Schiller have since admitted, however, these statements about Valeant's purported strong organic growth driven by volume increases were patently false.

86.     Valeant's significant growth was not attributable to volume increases, but rather was driven by significant price hikes on newly acquired products.

87.     Many of the drugs acquired by Valeant were designed to treat rare medical conditions.  Such drugs faced little competition from generic equivalents because of the small populations they serviced.  Moreover, due to a backlog at the FDA, there was a significant period before any such generic equivalents would come to market.  Accordingly, after Valeant acquired these drugs, it was able to – and did – significantly increase their prices with little scrutiny from the other participants in the pharmaceutical industry.

88.     For example, in early 2015, Marathon Pharmaceuticals LLC ("Marathon") was seeking to divest itself of about half a dozen medications as part as a change in business strategy.  Two of the drugs for sale were the heart medications, Isuprel and Nitropress.  At that time, there were no generic equivalents for Isuprel and Nitropress.

89.     Internal documents produced by Valeant to Congress show that in December 2014 and January 2015 Valeant conducted research on its ability to purchase Isuprel and Nitropress and immediately raise their prices.  According to a presentation dated January 16, 2015, Valeant believed that the drugs had pricing "flexibility by multiple orders of magnitude."

90.     The day after acquiring Isuprel and Nitropress, Valeant significantly raised their prices.  Specifically, a vial of Nitropress went from $257.80 to $805.61 (212% increase), and Isuprel was bumped up from $215.46 to $1,346.62 (525% increase).

91.     Isuprel and Nitropress were not the only drugs that Valeant acquired and increased prices.  Other drugs where Valeant implemented steep price increases to drive its revenue growth included:

- Targretin gel, a topical treatment for lymphoma, from $1,687 in 2009 to $30,320 in 2015 (1700% increase), most of which occurred after Valeant acquired the drug in 2013.

- Carac cream, used to treat precancerous skin lesions, from $159 in 2009 to $2,865 in 2015 (1700% increase), most of which occurred after Valeant acquired the drug in 2011.

- Syprine, a chelating agent for treatment of Wilson's disease, from $650 in 2010 to $21,000 in 2015 (3200% increase).

- Cuprimime, also a chelating agent for treatment of Wilson's disease, from $450 in 2010 to $26,000 in 2015 (5800% increase).

- Glumetza, a diabetes drug, from $900 to $10,000 (1100% increase).

92.     Despite their public statements to the contrary, Defendants were well aware of the connection between Valeant's price increases and its significant revenue growth.  For example, on May 21, 2015, Schiller sent Pearson an email with the subject, "price volume."  In that email, Schiller stated:  "Last night, one of the investors asked about price vs volume for Q1.  Excluding [Isuprel and Nitropress], *price represented about 60% of our growth*.  If you include [Isuprel and Nitropress], *price represents about 80%*."

93.     Both Pearson and Schiller have since admitted that Valeant's steep growth was the result of price increases, and not what was previously represented to the market.

94.     On February 4, 2016, Schiller appeared before Congress as Valeant's acting CEO. Schiller admitted to the congressional panel that 80% of Valeant's growth in the first quarter of 2015 was the result of price increases and not expanded market share.

95.     On April 27, 2016, Pearson appeared before Congress.  In his prepared remarks, Pearson confessed that Valeant had "made mistakes."  In delivering a *mea culpa* to the members of the Senate Committee on Aging, Pearson stated:  "[T]he company was too aggressive – and I, as its leader, was too aggressive – in pursuing price increases on certain drugs.  Let me state

plainly that it was a mistake to pursue, and in hindsight I regret pursuing, transactions where a central premise was planned increase in the prices of the medicines . . . ."

96.     During that hearing, Pearson was questioned by Senator McCaskill about whether growth was driven by price rather than volume between the first quarter of 2013 and the third quarter of 2015 for all but one quarter.  In response, Pearson admitted that, "Yes, ***pricing has driven more growth than volume***."

**E.     The Truth Gradually Emerges and the Prices of Valeant's Securities Plummet**

97.     Valeant's business was a house of cards built on unsustainable price increases, a secret network of pharmacies designed to exclusively peddle Valeant's products, and a culture of deception set by Pearson and Schiller that resulted in the manipulation of the Company's financial information.  As the truth about Philidor, Valeant's improper revenue recognition, and Valeant's artificial growth slowly leaked into the market through a series of partial disclosures, the price of Valeant securities dropped precipitously.

98.     On October 4, 2015, *The New York Times* published an article with the headline: "Valeant's Drug Price Strategy Enriches It, but Infuriates Patients and Lawyers."  While price increases for the drugs Valeant acquired had recently become the focus of public scrutiny, *The New York Times Article* was the first time that the market was apprised that Valeant's steep revenue growth might be driven by something other than organic sales.  Specifically, the article questioned Pearson's claim that Valeant was well-positioned for growth even without price increases.

99.     In response to this news, the price of Valeant securities fell.  Valeant common stock declined $18.86/share, or 10.3%, from a price of $182.32/share at the close of trading on October 2, 2015, to a price of $163.46/share at the close of trading on October 5, 2015.

100.    However, Valeant immediately took steps to attempt to dispel any suggestion that its public statements concerning its organic growth were materially misleading.  On October 5, 2015, the Company released a statement entitled "Valeant Corrects Misleading Reports," seeking to refute allegations leveled against Valeant by short sellers on the internet. On October 14, 2015, Pearson sent a letter to Senator McCaskill.  In that letter, Pearson noted that "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."  This was a "misperception," according to Pearson, because "volume growth contributes significantly more than price for our U.S. branded pharmaceutical business."

101.    On October 14, 2015, after the markets closed, Valeant issued a press release announcing that it had received two subpoenas, one from the U.S. Attorney's Office for the District of Massachusetts and one from the U.S. Attorney's Office for the Southern District of New York.  The documents requested by these prosecutors included, among other things, materials relating to "pricing decisions."  Thus, the market was notified that Valeant was being investigated for potential criminal violations.

102.    In response to this news, the price of Valeant securities fell again.  Valeant common stock declined $8.42/share, or 4.8%, from a price of $177.29/share at the close of trading on October 14, 2015, to a price of $168.87/share at the close of trading on October 15, 2015.

103.    Yet Valeant still continued to deny any wrongdoing.  In the same press release, Pearson was quoted as saying:  "All of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner."

104.     On October 19, 2015, during trading hours, Valeant held an investor call to address its third quarter results and the scrutiny it was receiving from the government and the media.  During that call, Valeant disclosed that for 2014 and through three quarters of 2015, price hikes, and not volume increases, accounted for the majority of Valeant's revenue growth from its U.S. branded pharmaceuticals portfolio.  Specifically, in 2014, volume accounted for 40% of growth, while prices increases accounted for 60% of growth.  In 2015, as of the October 19 disclosure, volume accounted for 41% of growth, and price increases accounted for 59%.

105.     Valeant also, for the first time, acknowledged the existence of Philidor, apparently in response to a California state lawsuit against Valeant that questioned the connection between Valeant and Philidor.  On the call, Pearson described Valeant's relationship with Philidor as follows:

> Philidor, one of our specialty pharmacy partners, provides prescription services to patients across the country, and provides administrative services for our co-pay cards and is a dispensary that fills prescriptions.  We have a contractual relationship with Philidor and late last year we purchased an option to acquire Philidor if we so choose.  Given accounting rules, we consolidate Philidor's financials.  Inventory held at Philidor remains on Valeant's books and is not included in the specialty pharmacy channel inventory.
>
> For many of our dermatology products, Philidor and other specialty pharmacies, dispense our medicine before adjudication of the reimbursement is finalized.  To ensure patients get their medicines prescribed quickly as a result we take on a risk for non-reimbursement.
>
> We understand that Philidor provides services under our programs for commercially insured and cash-paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs. It does not restrict prescriptions it fills to any particular manufacturers. It dispenses generic products as specified in the patient's prescription or as requested by the patient.

106.    Although Valeant finally disclosed that it had a "contractual relationship with Philidor," its disclosure was materially incomplete because it failed to disclose the true nature of the relationship between Valeant and Philidor (*i.e.*, that Philidor effectively was a division of Valeant that peddled Valeant's products only).

107.    In response to this news, the price of Valeant securities fell again.  Valeant common stock declined $13.73/share, or 7.73%, from a price of $177.56/share at the close of trading on October 16, 2015, to a price of $163.83/share at the close of trading on October 19, 2015.

108.    After the markets closed on October 19, *The New York Times* published an article entitled "Drug Makers Sidestep Barriers on Pricing."   The article disclosed that Philidor's application for a license to operate in California had been denied because Philidor had concealed its ties to Valeant.  According to the article, Valeant used Philidor to "keep the health system paying for high-priced drugs."

109.    In response to this news, the price of Valeant securities dropped.  Valeant common stock declined $17.09/share, or 10.4%, from a price of $163.83/share at the close of trading on October 19, 2015, to a price of $146.74/share at the close of trading on October 20, 2015.

110.    Plaintiffs liquidated their entire position in Valeant common stock by October 20, 2015, having suffered huge losses in connection with the partial disclosures alleged above and as a result of Defendants' materially false and misleading statements and omissions of material fact.

111.    Over the rest of 2015 and the first half of 2016, more facts about Philidor and Valeant's volume growth were publicly disclosed.

112.    For example, on October 21, 2015, Citron published a research article claiming that it had a "smoking gun" and asking the question:  "Could this be the Pharmaceutical Enron?"  The Citron report claimed that Valeant was using a secret network of mail-order specialty pharmacies to force patients to purchase Valeant medications.  The report claimed that Philidor shared a phone number with other, purportedly independent pharmacies.  Citron concluded that "it appears to Citron that Valeant/Philidor have created an entire network of phantom captive pharmacies."

113.    Valeant issued a press release seeking to downplay the accusations in the Citron report.  The press release was titled, "Valeant Pharmaceuticals Responds to Erroneous Report."

114.    On October 22, 2015, BMO Capital Markets Corp. ("BMO") downgraded its guidance on Valeant to "market perform" due, in part, to it having received no satisfactory explanation for Valeant's use of Philidor and concealment of that relationship.  BMO – which had previously been bullish on Valeant – found Valeant's relationship with Philidor to be "questionable."

115.    That same day, *Bloomberg* published an article entitled "Valeant Still Has Explaining to Do, Citron's Left Says."  In the article, *Bloomberg* quoted the drug industry's Washington lobbying group, Pharmaceutical Research and Manufacturers of America, as describing Valeant's business strategy as "more reflective of a hedge fund than an innovative biopharmaceutical company."  The article also quoted Adam Fein, president of Pembroke Consulting Inc., as saying:  "What Valeant was doing, whether right or wrong, was very, very unusual and not consistent with practices that other pharmaceutical manufactures use."

116.    On Sunday, October 25, 2015, *The Wall Street Journal* published an article entitled "Valeant and Pharmacy More Intertwined Than Thought."  The article included more

details about Valeant's ties to Philidor, disclosing that several Valeant employees had been sent to work at Philidor and had used the pop culture aliases Peter Parker, Jack Reacher and Brian Wilson.  The article also noted that Valeant had used Philidor to "fuel its business."  Philidor "can steer patients to Valeant's drugs, rather than less-expensive alternatives, and then help negotiate reimbursements with insurers," the article revealed.

117.    On October 26, 2015, Valeant released a 90-page PowerPoint presentation on Philidor.  Valeant disclosed, among other things:  (a) how it used Philidor to generate revenues through alternate fulfillment; (b) that Philidor represented 6.8% of Valeant's total revenue for the third quarter of 2015; (c) that Valeant had entered into the option purchase agreement with Philidor in December 2014; (d) that Philidor had agreements with other pharmacies to distribute in California, where Philidor was not licensed; (e) that Valeant had long considered Philidor a VIE; and (f) that its management and board of directors had toured Philidor's facilities prior to entering into the purchase option agreement.

118.    However, this presentation still failed to disclose the full truth about Philidor and was materially misleading to the extent it claimed that Philidor was immaterial to Valeant's business.

119.    On October 28, 2015, after the markets closed, *The Wall Street Journal* published an article entitled "Pharmacy's Sales Tactics Disclosed."  The article revealed that Philidor had been in engaging in highly questionable practices to sell Valeant's products.

120.    The next day, while the markets were still open, it was reported by Dow Jones Newswire that CVS/Caremark – one of the largest PBM's in the United States – had terminated Philidor from its network of pharmacies.

121.    After the markets closed on October 29, 2015, the other two of the "big three" PBMs – Express Scripts and OptumRx – also cut ties with Philidor.

122.    The next day, Friday, October 30, 2015, Valeant announced that it was severing its connections with Philidor and that Philidor would be closing its doors imminently.  In a statement released by Valeant, Pearson was quoted as saying:  "The newest allegations about activities at Philidor raise additional questions about the company's business practices. . . .  We have lost confidence in Philidor's ability to continue in a manner that is acceptable to Valeant and the patients and doctors we serve."  However, this statement – in which Valeant tried to distance itself from Philidor – was materially misleading because it did not reveal the full extent of Valeant's involvement with Philidor and how material Philidor was to Valeant's business.

123.    On November 4, 2015, it was disclosed that the Senate had launched a formal probe into Valeant's business practices.

124.    After the markets closed on November 4, 2015, *The Wall Street Journal* reported that Pershing Square – one of Valeant's largest shareholders – was considering the removal of Pearson as CEO due to the turbulence surrounding Valeant.  In addition, it was disclosed that the head of Pershing Square, Bill Ackman, had requested that Valeant management "come clean" and disclose the full extent of their knowledge regarding Philidor.

125.    On November 10, 2015, Valeant held an investor call to provide an update to the market.  During that call, Pearson disclosed that Philidor had committed to cease operations by January 31, 2016, at the latest.  Pearson also revealed the impact that the Philidor scandal was having on Valeant's operations:  "In the very short term, disruption in our dermatology business will be significant.  Last week, we asked Philidor to stop adjudicating claims and to fill all prescriptions at no cost for the week."

126.    On November 11, 2015, *Bloomberg* released an article warning of a "revenue squeeze" at Valeant due to the loss of Philidor and the scrutiny over drug price increases.  As a result, Valeant could breach important covenants to its lenders, which would be disastrous for Valeant and its shareholders.

127.    On November 12, 2015, *Bloomberg* published another article providing further details on Valeant's relationship with Philidor and how Philidor peddled Valeant products over cheaper generic alternatives.

128.    On November 16, 2015, *Bloomberg* reported that Congressman Elijah Cummings had demanded that Pearson make the Valeant employees involved with Philidor available for interviews.

129.    Before the market opened on December 17, 2015, an analyst at Mizuho Securities USA ("Mizuho") downgraded Valeant from "buy" to "neutral," pointing to a lack of clarity in Valeant's disclosures.

130.    On December 28, 2015, Valeant announced that Pearson had left the Company on medical leave.  On January 6, 2016, Valeant announced that Schiller – who had left his position as CFO in 2015 but remained on the Company's board – would be taking over as interim CEO.

131.    On February 19, 2016, several news outlets reported on a Wells Fargo analyst's detailed review of Valeant.  Among other things, the Wells Fargo analyst questioned Valeant's claim that Philidor accounted for only 7% of revenues, given that the unwinding of that revenue from Valeant's financials resulted in a one-third reduction in earnings-per-share.  The analyst also found that Valeant's accounting did not match up to its performance.  Accordingly, the analyst concluded that Valeant was at "substantial risk" of having misstated its financials.

132.     On February 22, 2016, while the markets were still open, it was reported that Valeant would likely be restating some of its financials based on its internal review of Philidor. On this news, the price of Valeant securities again fell precipitously.

133.     After the markets closed, Valeant issued a press release confirming that it expected to have to restate its financials.

134.     On February 28, 2016, Valeant issued a press release announcing that Pearson was returning from medical leave and that, as a result, it would reschedule its previously announced call for February 29 to discuss its fourth quarter 2015 results.

135.     During trading hours on February 29, 2016, *Moody's* reported that it had placed Valeant's corporate credit rating "under review for downgrade" because of concerns about Valeant's operating performance.

136.     On March 15, 2016, before the market opened, Valeant announced that it was reducing its financial guidance for 2016 as a result of the termination of its relationship with Philidor, making the materiality of Philidor painfully obvious to investors.  In a release issued that same day, Valeant disclosed $51.3 million in "wind down" costs for Philidor.

137.     On June 7, 2016, Valeant announced its results for the first quarter of 2016.  The results were not good, primarily because of the hit the Company had taken in having to shut down its clandestine network of specialty pharmacies.  Specifically, revenues from Valeant's skin care products – the very products that Valeant used Philidor to peddle – were down 43% from the same quarter in 2015.

## II.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.  Misrepresentations and Omissions about Valeant's Ties to Philidor

#### 1.  Valeant Misleads Investors about Its Alternate Fulfillment Program

138.  Throughout the relevant period, Defendants made several statements about the purported success of Valeant's alternate fulfillment program without disclosing the truth about that program – *i.e.*, that Valeant was secretly using Philidor to steer patients to Valeant products while concealing any links between Valeant and Philidor.  Defendants' decision to speak about the AF program without disclosing Valeant's ties to and use of Philidor rendered their statements about alternative fulfillment materially incomplete and misleading.

139.  On January 4, 2013, Pearson and Schiller held an investor call to discuss Valeant's financial guidance for 2013.  During that call, Pearson discussed the alternate fulfillment program:  "[T]he more we understand about it, the more excited we get about it, quite frankly because it's not just a singular sort of initiative that there's a while evolution being planned in terms of the Stage I, Stage II, Stage III.  And there's some exciting opportunities there that we are not going to give specifics of."  Later in in the call, Pearson spoke more about alternate fulfillment:  "[T]he AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but, hopefully, can be used to start generating truly profitable scripts through a different channel."

140.  On February 28, 2013, Pearson and Schiller held an investor conference call where they again touted the benefits of the AF program.  When asked, however, how the AF program contributes to growth, Pearson stated:  "We have never given details. . . . So when I can give details in terms of what's flowing through full alternate fulfillment, what's not.  What we can reiterate is that all of our key brands in dermatology . . . are now growing."

141.     On May 8, 2014, Pearson and Schiller held an investor call to discuss Valeant's first quarter results.  During that call, Pearson was asked about the marketing of Valeant's dermatology products.  In response, Pearson referred to Valeant's alternate fulfillment program: "[W]e worked on . . . a much more sophisticated alternate fulfillment system that we've implemented in the US, which is really helping. . . .   [W]e've applied that to a number of our other products, which is also helping in terms of the growth."

142.     The statements above in paragraphs 139 through 141, which caused Valeant securities to trade at artificially inflated prices, were materially misleading and incomplete because they failed to disclose the covert network of specialty pharmacies that Valeant was developing to implement its AF program.  Valeant's secretive deployment of Philidor to peddle its high-priced products over cheaper generic equivalents subjected Valeant to serious regulatory and reimbursement risks that would materialize if other participants in the industry knew of Valeant's relationship with Philidor.  Had they known that Philidor was effectively a division of Valeant, large PBMs would have scrutinized and denied reimbursement requests from Philidor because of the likelihood that the specialty pharmacy was just a shill for Valeant.  This was subsequently confirmed when the three largest PBMs dropped Philidor from their networks after Philidor's relationship with Valeant was revealed in late 2015.

### 2.     Valeant's Failure to Disclose Its Connection to Philidor Prior to the Purchase Option Agreement

143.     After forming Philidor in January 2013, Valeant issued its quarterly financial reports without revealing that Philidor was a material VIE.  Specifically:

- On May 3, 2013, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2013 (the "1Q2013 10-Q").  Valeant represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S.

GAAP') for interim financial reporting." However, those financial statements contained no mention of Philidor as a material unconsolidated VIE.

- On August 7, 2013, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2013 (the "2Q2013 10-Q"). Valeant again represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting." However, those financial statements again contained no mention of Philidor as a material unconsolidated VIE.

- On November 1, 2013, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2013 (the "3Q2013 10-Q"). Valeant again represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting." However, those financial statements again contained no mention of Philidor as a material unconsolidated VIE.

144.    On February 28, 2014, Valeant filed its annual report on Form 10-K with the SEC for the year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Pearson and Schiller. In the 2013 10-K, Valeant, Pearson and Schiller represented that the audited financial statements included therein were "prepared in accordance with U.S. generally accepted accounting principles." In Note 2 to its Consolidated Financial Statements – entitled "Significant Accounting Policies" – Valeant, Pearson and Schiller represented that, "[t]here were no material arrangements determined to be variable interest entities." They made this statement notwithstanding that Valeant had been operating Philidor effectively as a division of the Company for the entirety of 2013.

145.    Valeant's quarterly financial statements for the first three quarters of 2014 also failed to disclose that Philidor was a material VIE. Specifically:

- On May 9, 2014, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2014 (the "1Q2014 10-Q"). Valeant again represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting." However, those financial statements contained no mention of Philidor as a material unconsolidated VIE.

- On August 1, 2014, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2014 (the "2Q2014 10-Q"). Valeant again represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting." However, those financial statements again contained no mention of Philidor as a material unconsolidated VIE.

- On October 24, 2014, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2014 (the "3Q2014 10-Q"). Valeant again represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting." However, those financial statements again contained no mention of Philidor as a material unconsolidated VIE.

146. The statements above in paragraphs 143 through 145, which caused Valeant securities to trade at artificially inflated prices, were materially false, misleading and incomplete because the fact that Philidor was a material unconsolidated VIE required Defendants to disclose certain information about Philidor pursuant to ASC 810. Specifically, Valeant was required to disclose, among other things: (a) quantitative and qualitative information about Valeant's ties to Philidor, including the "nature, purpose, size and activities" of Philidor, and how Philidor was financed; and (b) Valeant's methodology for concluding that it was not required to consolidate Philidor's financial statements with its own, including disclosure of key factors, assumptions and significant judgments used in making the determination. *See* ASC 810-10-50-5A. Moreover,

Valeant was required to disclose information concerning: (a) significant judgments and assumptions made in determining whether it needed to consolidate Philidor and/or disclose information about its involvement with Philidor; (b) the "nature of, and changes in, the risks associated with" Valeant's involvement with Philidor; and (c) how Valeant's involvement with Philidor affected Valeant's "financial position, financial performance and cash flows." *See* ASC 810-10-50-8.

147.    Furthermore, each of Valeant's 1Q2013 10-Q, 2Q2013 10-Q, 3Q2013 10-Q, 2013 10-K, 1Q2014 10-Q, 2Q2014 10-Q, and 3Q2014 10-Q contained an MD&A section. However, Valeant failed to disclose Philidor as a distinct sales channel in any of those reports. The MD&A in each of each of Valeant's 1Q2013 10-Q, 2Q2013 10-Q, 3Q2013 10-Q, 2013 10-K, 1Q2014 10-Q, 2Q2014 10-Q, and 3Q2014 10-Q reports, which caused Valeant securities to trade at artificially inflated prices, was materially misleading and incomplete because, under SAB Topic 13, Valeant had an obligation to disclose Philidor as a distinct sales channel in its MD&A. Specifically, Valeant was required to disclose Philidor as a "[c]hanging trend[] in shipments into . . . a sales channel . . . that could be expected to have a significant effect on future sales or sale returns." By the third quarter of 2015, sales through Philidor were accounting for at least approximately 7% of Valeant's revenues, and likely more given the substantial decline in Valeant's revenue following Philidor's closure. Thus, Valeant was required to disclose its use of Philidor as a changing trend in a sales channel that was expected to have a significant effect on Valeant's sales.

148.    The 2013 10-K was also materially false and misleading because Valeant failed to consolidate Philidor in its financial statements. Under ASC 810, Valeant was required to consolidate any VIE for which it was the primary beneficiary. As Philidor's only client, Valeant

was the primary beneficiary of Philidor even prior to entering into the purchase option agreement. Accordingly, Valeant should have consolidated Philidor in its financial statements prior to 2014, and its failure to do so rendered its 2013 financial reports materially false and misleading.

### 3. Valeant's Failure to Disclose Its Connection to Philidor after the Purchase Option Agreement

149.   In December 2014, Valeant entered into the purchase option agreement with Philidor, which required Valeant to consolidate Philidor's financials. However, Valeant still failed to disclose Philidor as a material consolidated VIE prior to October 2015.

150.   Specifically, on February 25, 2015, Valeant filed its annual report on Form 10-K for the year ended December 31, 2014 ("2014 10-K"). The 2014 10-K was signed by Pearson and Schiller. Valeant, Pearson and Schiller again represented that the audited financial statements included therein were "prepared in accordance with U.S. generally accepted accounting principles." In Note 2 to its Consolidated Financial Statements – entitled "Significant Accounting Policies" – Valeant, Pearson and Schiller represented that, "[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ("VIEs") for which the Company is the primary beneficiary." In Note 3 to its Consolidated Financial Statements – entitled "Business Combinations" – Valeant, Pearson and Schiller represented that, "[d]uring the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate." The 2014 10-K contained no references to Philidor.

151.   On April 30, 2015, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2014 (the "1Q2015 10-Q"). Valeant represented that the

financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting."  However, those financial statements again contained no mention of Philidor as a material consolidated VIE.

152.    On July 28, 2015, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015 (the "2Q2015 10-Q").  Valeant again represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting."  However, those financial statements contained no mention of Philidor as a material consolidated VIE.

153.    The statements above in paragraphs 150 through 152, which caused Valeant securities to trade at artificially inflated prices, were materially false, misleading and incomplete because the fact that Philidor was a material consolidated VIE required Defendants to disclose certain information about Philidor pursuant to ASC 810.  Specifically, Valeant was required to disclose, among other things, quantitative and qualitative information about Valeant's ties to Philidor, including the "nature, purpose, size and activities" of Philidor, and how Philidor was financed.  *See* ASC 810-10-50-5A.  Additionally, Valeant was required under U.S. GAAP to disclose the factors that resulted in the consolidation of Philidor – *i.e.*, the purchase option agreement with Philidor.  *See id.*  Moreover, Valeant was required to disclose information concerning:  (a) significant judgments and assumptions made in determining whether it needed to consolidate Philidor and/or disclose information about its involvement with Philidor; (b) the "nature of, and changes in, the risks associated with" Valeant's involvement with Philidor; and

(c) how Valeant's involvement with Philidor affected Valeant's "financial position, financial performance and cash flows." *See* ASC 810-10-50-8.

154.    Furthermore, each of Valeant's 2014 10-K, 1Q2015 10-Q, and 2Q2015 10-Q contained an MD&A section.  However, Valeant failed to disclose Philidor as a distinct sales channel in any of those reports.  The MD&A in each of each of Valeant's 2014 10-K, 1Q2015 10-Q, and 2Q2015 10-Q reports, which caused Valeant securities to trade at artificially inflated prices, was materially misleading and incomplete because, under SAB Topic 13, Valeant had an obligation to disclose Philidor as a distinct sales channel in its MD&A.  Specifically, Valeant was required to disclose Philidor as a "[c]hanging trend[] in shipments into . . . a sales channel . . . that could be expected to have a significant effect on future sales or sale returns."  SAB Topic 13.B.   By the third quarter of 2015, sales through Philidor were accounting for at least approximately 7% of Valeant's revenues and likely far more given the substantial declines in Valeant's revenues following Philidor's closure.  Thus, Valeant was required to disclose its use of Philidor as a changing trend in a sales channel that was expected to have a significant effect on Valeant's sales.

## B.    Misrepresentations Concerning the Reason for Valeant's Steep Revenue Growth

155.    Throughout 2014 and 2015, Defendants repeatedly misrepresented that Valeant's revenue growth was driven by organic factors, *i.e.*, increased sales volume.   However, Defendants' statements were materially false and misleading because they failed to disclose that Valeant's steep growth was actually caused by Valeant's unsustainable practice of acquiring new medications and then raising the prices on those drugs.

156.    On January 7, 2014, Pearson and Schiller held an investor call to discuss Valeant's financial guidance for 2014.  During the conference, Pearson stated that Valeant's

revenue growth was driven through organic growth of Valeant's existing products:  "[Valeant's growth in revenues] *is a result of achieving strong organic growth* in a fiscally responsible manner for the products that we already own . . . ."

157.   On May 28, 2014, Valeant held an investor call to respond to accusations by Allergan that Valeant's business model was based on price hikes and was not sustainable.  In adamantly denying Allergan's claims, Pearson told investors that Valeant "has delivered *strong organic growth* since I have been here."

158.   Also on May 28, 2014, Pearson participated in the Sanford C. Bernstein Strategic Decisions Conference.  Pearson was asked several questions during the conference about the drivers behind Valeant's growth.  After noting that Valeant's ability to raise prices was capped for certain products, he told attendees:  [W]e focus on volume growth, and *the vast majority of our growth on a global basis . . . is volume*."

159.   On June 17, 2014, Pearson and Schiller held an investor call to address additional questions raised by Allergan about Valeant's business in trying to fend off a hostile takeover bid by Valeant.  On that call, Pearson again stated that volume, not price, was the primary driver of Valeant's growth.  Pearson suggested that when Valeant breaks down its organic growth into "volume and price parts," "I suspect it will be surprising to people because I think *volume is a much larger piece of our organic growth* than most people would assume it is."

160.   On January 8, 2015, Pearson and Schiller held an investor call to discuss Valeant's guidance for 2015.  During that call, Pearson reflected on Valeant's growth, stating: "Our *robust organic growth* profile is evidenced by our ability to deliver double-digit organic growth, not only in 2014 and 2015 but strong organic growth for the foreseeable future."

161.    On April 29, 2015, Pearson and Schiller held an investor call in connection with
the release of Valeant's first quarter financial results.  During the call, one analyst asked Pearson
to quantify how price and volume contributed to Valeant's first quarter growth.  The analyst
asked Pearson:  "If you could just quantify a little bit, how much was price versus volume that
contributed to growth in 1Q?"  Pearson responded:

> In terms of price volume, ***actually volume was greater than price
> in terms of our growth***.  Outside the United States ***it's all volume* .
> . . .  And in the U.S. *it's shifting more to volume than price*, and
> we expect that to continue . . . .  A lot of our prices, for most of our
> products, are negotiated with managed care.  And ***there's only a
> limited amount of price we can take*. . . .  *So it's primarily volume*
> . . . .

162.    During the week of May 18, 2015, RBC Capital Markets hosted Valeant-related
investor events in Canada at which Pearson spoke.  During those events, the source of Valeant's
growth was questioned several times.  In discussing Valeant's growth, Pearson stated the
following:  "We've been accused of raising price, but our organic growth is ***more volume-based
than price-based***, and will continue to be."

163.    On September 28, 2015, Valeant filed a Form 8-K with the SEC that attached a
letter that Pearson had sent that day to Valeant's employees.  In that letter, Pearson made several
statements about Valeant's purported organic growth being driven by volume increases and not
price increases.  Specifically, Pearson stated:  "Valeant is well-positioned for ***strong organic
growth, even assuming little to no price increases***."  Pearson further stated:  "Valeant's core
operating principles include a ***focus on volume growth*** . . . .  [T]he majority of our portfolio will
continue to deliver ***strong volume-based organic growth and is not dependent on price
increases***."

164.    The statements above in paragraphs 156 through 163, which caused Valeant
securities to trade at artificially inflated prices, were materially false and misleading because

Valeant's growth was not driven by organic volume growth, but by Valeant's unsustainable practice of acquiring pharmaceuticals and immediately raising the prices on those drugs. Indeed, when appearing before the U.S. Senate on April 27, 2016, Pearson admitted that for each quarter (except one) between January 1, 2013 and September 30, 2015, "*pricing has driven more growth than volume*." Furthermore, in a May 21, 2015 email to Pearson, Schiller stated that for the first quarter of 2015, *price represented "about 80%" of Valeant's growth*. On February 4, 2016, Schiller testified before Congress and confirmed that 80% of Valeant's growth in the first quarter of 2015 was the result of price increases and not expanded market share. In addition, on October 19, 2015, Valeant released a presentation showing that its revenue growth for 2014 and the first three quarters of 2015 in the U.S. branded prescription portfolio was due more to price hikes that volume increases.

III.   **SUMMARY OF DEFENDANTS' SCIENTER**

165.   Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

166.   Defendants Pearson and Schiller acted with scienter with respect to the materially false and misleading statements and omissions of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were false when made. As the most senior executives of Valeant during the relevant time period, Pearson's and Schiller's scienter is imputable to Valeant.

167.   Pearson and Schiller knew, or at the very least recklessly disregarded, prior to October 19, 2015 that Philidor was effectively a division of Valeant whose sole purpose was to steer patients toward Valeant products even when much cheaper generic alternatives were available. In fact, Pearson and Schiller have never denied such knowledge, but rather admitted that they did not disclose the arrangement with Philidor because they believed it was a

competitive advantage.  As explained above, Pearson frequently touted the benefits of Valeant's alternate fulfillment program – which consisted of Philidor and its secret network of pharmacies – but refused to ever discuss "details" about that program.

168.   Valeant has also disclosed that prior to entering into the purchase option agreement with Philidor in December 2014, the majority of Valeant's board of directors – of which both Pearson and Schiller were members – toured Philidor in person, and that Pearson and Schiller were responsible for the decision to enter into the purchase option agreement with Philidor.

169.   Pearson and Schiller admitted in an October 26, 2015 presentation to investors that it was they who determined "the appropriate accounting treatment" for Philidor.  In doing so, Pearson and Schiller recklessly disregarded the requirements of ASC 810 and SAB Topic 13, which required them to disclose the "nature, purpose, size and activities" of Philidor, how Philidor was financed, significant judgments and assumptions made in determining whether Valeant needed to consolidate Philidor and/or disclose information about its involvement with Philidor, the "nature of, and changes in, the risks associated with" Valeant's involvement with Philidor, and how Valeant's involvement with Philidor affected Valeant's "financial position, financial performance and cash flows."  *See* ASC 810-10-50-5A; ASC 810-10-50-8.  Valeant was also required to disclose Philidor as a distinct sales channel in the MD&A in Valeant's periodic filings with the SEC.  *See* SAB Topic 13.B.

170.   Pearson and Schiller's assertion in the October 26, 2015 presentation that they were not required to disclose Philidor because Valeant's sales to Philidor did not account for more than 10% of its revenues is nothing more than a pretext for their reckless disregard of the accounting rules.  Philidor was not a customer of Valeant; it was effectively operating as a

division of Valeant.  Once Philidor's financials were consolidated with Valeant, the notion that Philidor had to meet the 10% customer sales threshold for disclosure is rendered even more absurd because at that point even Valeant considered Philidor to be a part of Valeant and not a customer.

171.    Pearson and Schiller knew that the illegitimate sales channel they created was highly material to Valeant's business.  Indeed, their claim that Philidor was not material to Valeant is belied by the adverse financial impact that Philidor's closure had on Valeant and by the market's negative reaction to the several disclosures about Philidor from October 19, 2015 and into the middle of 2016.

172.    The reason that Pearson and Schiller intentionally concealed Philidor is apparent. The concealment of Valeant's relationship with Philidor was essential to Valeant being able to channel sales through Philidor.  So long as the PBMs had no idea about the connection between Philidor and Valeant, they had no reason to suspect any collusion.  Of course, when they eventually found out about Valeant's deceptive use of Philidor to move Valeant products, the three major PBMs – which account for 80% of the market – immediately cut ties with Philidor.

173.    Pearson and Schiller knew, or at the very least recklessly disregarded, that between January 1, 2013 and September 30, 2015, Valeant's steep revenue growth was driven not by organic volume increases, but rather primarily by Valeant's unsustainable practice of acquiring medications and drastically increasing their prices.  Indeed both Pearson and Schiller have since admitted that Valeant's growth was the result of price increases, and not what was previously represented to the market.

174.    On April 27, 2016, Pearson appeared before Congress.  In his prepared remarks, Pearson confessed that Valeant had "made mistakes" and that he personally was too aggressive

in seeking price increases to drive revenue:  "[T]he company was too aggressive – and I, as its leader, was too aggressive – in pursuing price increases on certain drugs.  Let me state plainly that it was a mistake to pursue, and in hindsight I regret pursuing, transactions where a central premise was planned increase in the prices of the medicines . . . ."

175.    During that hearing, Pearson was questioned by Senator McCaskill about whether growth was driven by price rather than volume between the first quarter of 2013 and the third quarter of 2015 for all but one quarter.  In response, Pearson admitted that, "Yes, pricing has driven more growth than volume."

176.    On February 4, 2016, Schiller appeared before Congress as Valeant's acting CEO. Schiller admitted to the congressional panel that 80% of Valeant's growth in the first quarter of 2015 was the result of price increases and not expanded market share.

177.    Indeed, Valeant's practice – at the behest of Pearson and Schiller – of driving revenue growth through price increases formed the core of its operations.  Rather than follow the traditional model of developing new drugs by investing in R&D, Pearson and Schiller implemented a strategy of acquiring already developed drugs and increasing revenues through price hikes.  Pearson and Schiller were thus well aware that organic volume increases were not the primary driver of Valeant's revenue growth.

178.    As the CEO and CFO of Valeant, respectively, Pearson and Schiller were acutely aware of what was driving Valeant's growth.  This is corroborated by internal Valeant documents.  For example, on May 21, 2015, Schiller sent Pearson an email with the subject, "price volume."  In that email, Schiller stated:  "Last night, one of the investors asked about price vs volume for Q1.  Excluding [Isuprel and Nitropress], price represented about 60% of our growth.  If you include [Isuprel and Nitropress], price represents about 80%."  Despite receiving

this emails from Schiller, Pearson continued to make misstatements about organic volume-driven growth.

179.    In 2016, both Pearson and Schiller were forced out of Valeant.

## IV.    PRESUMPTION OF RELIANCE

180.    Plaintiffs intend to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:    (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) Valeant securities traded in efficient markets; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Valeant securities; and (e) Plaintiffs purchased Valeant securities between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

181.    The market for Valeant common stock was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, Valeant common stock traded at artificially inflated prices during the relevant period.  The artificial inflation continued until the time the market fully came to realize the nature and extent of the Valeant's misrepresentations and omissions concerning Valeant's organic growth and Philidor.

182.    At all relevant times, the market for Valeant common stock was efficient for the following reasons, among others:  (a) Valeant filed periodic reports with the SEC; (b) Valeant common stock met the requirements for listing, and was listed and actively traded, on the NYSE; (c) numerous analysts followed Valeant; and (d) Valeant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging

public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

183.    Plaintiffs relied on the market price of Valeant's common stock, which reflected all the information in the market, including the misstatements by Defendants.

184.    Plaintiffs are also entitled to a presumption of reliance under *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material facts which there was a duty to disclose.

## V.    LOSS CAUSATION

185.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Valeant common stock, set forth in Exhibits A through B, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions of material facts.  As a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements, as detailed above in paragraphs 97 through 109, the price of those securities declined precipitously, and Plaintiffs were damaged.

186.    Defendants concealed the existence of Philidor and Valeant's relationship to Philidor.  In doing so, they concealed the foreseeable risk to Valeant's business if market participants discovered the true nature of the relationship between Valeant and Philidor (*i.e.*, that Philidor effectively was a division of Valeant) and that Valeant, through Philidor, had created an entire network of phantom captive pharmacies that Valeant was using to peddle its products. Beginning with the October 19, 2015 partial disclosure of Philidor by Valeant, that foreseeable risk gradually materialized, thus causing the price of Valeant securities to decline as detailed above.

187.    Defendants misrepresented to investors that Valeant's revenue growth was driven primarily by organic volume growth.   In doing so, they concealed the foreseeable risk that Valeant's rapid growth was unsustainable if it was driven primarily by price increases on newly acquired drugs.   Beginning with the October 4, 2015 partial disclosure that Valeant may not be well-positioned for growth even without price increases, that foreseeable risk gradually materialized, thus causing the price of Valeant securities to decline as detailed above.

## VI.   <u>NO SAFE HARBOR</u>

188.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.   Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Valeant who knew that those statements were false when made.

## VII.    FRAUD-BASED CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
#### Against All Defendants

189.    Plaintiffs repeat and reallege each and every paragraph contained above as if set forth herein.

190.    This cause of action is brought against Defendants Valeant, Pearson and Schiller for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

191.    Defendants Valeant, Pearson and Schiller both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to:  (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Valeant securities; and (iii) cause Plaintiffs to purchase Valeant securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Valeant, Pearson and Schiller took the actions set forth above.

192.    Defendants Valeant, Pearson and Schiller both directly and indirectly:   (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Valeant securities in an effort to artificially inflate and maintain the market prices for Valeant securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

193.    By virtue of their high-level positions at the Company, Pearson and Schiller were authorized to make public statements, and made public statements on Valeant's behalf.  These

senior executives were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the investing public that they recklessly disregarded was materially false and misleading.

194.    In addition, Valeant, Pearson and Schiller had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading so that the market price of the Company's common stock would be based on truthful, complete and accurate information.

195.    Defendants Valeant, Pearson and Schiller acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants Valeant's, Pearson's and Schiller's material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to Valeant's operations, business, performance and prospects from the investing public, including concealing the existence of certain information about Philidor that they had a legal obligation to disclose and misstating that Valeant's growth derived from organic volume increases.   By concealing these material facts from investors, Valeant, Pearson and Schiller supported the artificially inflated price of Valeant's common stock.

196.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the market price of Valeant's common stock.  In ignorance of the fact that the market prices were artificially inflated, and relying directly or indirectly upon the materially false and misleading statements made by Defendants, and upon the integrity of the market in which the Company's securities trade, or

upon the absence of material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs purchased Valeant common stock at artificially inflated prices. As a series of partial but inadequate disclosures were issued, the price of Valeant's securities substantially declined.

197.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known the truth with respect to the business, operations, performance and prospects of Valeant, which was concealed by Defendants, Plaintiffs would not have purchased Valeant common stock, or if they had purchased such securities, they would not have done so at the artificially inflated prices that they paid.

198.    By virtue of the foregoing, Defendants Valeant, Pearson and Schiller have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

199.    As a direct and proximate result of Defendants Valeant's, Pearson's, and Schiller's, wrongful conduct, Plaintiffs have suffered damages in connection with their transactions in the Company's common stock.

200.    Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein. Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against Defendants Pearson and Schiller

201.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

202.     This Cause of Action is asserted against Defendants Pearson and Schiller and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

203.     Each of Defendants Pearson and Schiller was at the time of the wrongs alleged herein a controlling person of Valeant within the meaning of Section 20(a) of the Exchange Act.

204.     By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge or reckless disregard of the materially false and misleading statements filed with the SEC and disseminated to the investing public, Defendants Pearson and Schiller had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making of the Company.

205.     Defendants Pearson and Schiller were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements of cause the statements to be corrected.   In particular, Defendants Pearson and Schiller each had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

206.     Defendants Pearson and Schiller culpably participated in Valeant's violation of Section 10(b) and Rule 10b-5 with respect to the First Cause of Action.

207.     By reason of the conduct alleged in the First Cause of Action, Valeant is liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and

Defendants Pearson and Schiller are liable pursuant to Section 20(a) based on their control of Valeant.

208.     Defendants Pearson and Schiller are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchases of Valeant securities.

209.     Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## NEGLIGENCE-BASED CLAIMS

210.   For purposes of Plaintiffs' Section 18 and negligent misrepresentation claims, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct.

## I.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

211.   On February 28, 2014, Valeant filed its annual report on Form 10-K with the SEC for the year ended December 31, 2013 (the "2013 10-K").  The 2013 10-K was signed by Pearson and Schiller.  In the 2013 10-K, Valeant, Pearson and Schiller represented that the audited financial statements included therein were "prepared in accordance with U.S. generally accepted accounting principles."  In Note 2 to its Consolidated Financial Statements – entitled "Significant Accounting Policies" – Valeant, Pearson and Schiller represented that, "[t]here were no material arrangements determined to be variable interest entities."  They made this statement notwithstanding that Valeant had been operating Philidor effectively as a division of the Company for the entirety of 2013.

212.   These statements, which caused Valeant securities to trade at artificially inflated prices, were materially false, misleading and incomplete because the fact that Philidor was a material unconsolidated VIE required Defendants to disclose certain information about Philidor pursuant to ASC 810.  Specifically, Valeant was required to disclose, among other things: (a) quantitative and qualitative information about Valeant's ties to Philidor, including the "nature, purpose, size and activities" of Philidor, and how Philidor was financed; and (b) Valeant's methodology for concluding that it was not required to consolidate Philidor's financial statements with its own, including disclosure of key factors, assumptions and significant judgments used in making the determination.  *See* ASC 810-10-50-5A.  Moreover, Valeant was required to disclose information concerning:  (a) significant judgments and assumptions made in determining whether it needed to consolidate Philidor and/or disclose information about its

involvement with Philidor; (b) the "nature of, and changes in, the risks associated with" Valeant's involvement with Philidor; and (c) how Valeant's involvement with Philidor affected Valeant's "financial position, financial performance and cash flows."  *See* ASC 810-10-50-8.

213.    Furthermore, Valeant's 2013 10-K contained an MD&A section.  However, Valeant failed to disclose Philidor as a distinct sales channel.  The MD&A in Valeant's 2013 10-K, which caused Valeant securities to trade at artificially inflated prices, was materially misleading and incomplete because, under SAB Topic 13, Valeant had an obligation to disclose Philidor as a distinct sales channel in its MD&A.  Specifically, Valeant was required to disclose Philidor as a "[c]hanging trend[] in shipments into . . . a sales channel . . . that could be expected to have a significant effect on future sales or sale returns."  By the third quarter of 2015, sales through Philidor were accounting for at least approximately 7% of Valeant's revenues, and likely more given the substantial decline in Valeant's revenue following Philidor's closure.  Thus, Valeant was required to disclose its use of Philidor as a changing trend in a sales channel that was expected to have a significant effect on Valeant's sales.

214.    The 2013 10-K was also materially false and misleading because Valeant failed to consolidate Philidor in its financial statements.   Under ASC 810, Valeant was required to consolidate any VIE for which it was the primary beneficiary.  As Philidor's only client, Valeant was the primary beneficiary of Philidor even prior to entering into the purchase option agreement.  Accordingly, Valeant should have consolidated Philidor in its financial statements prior to 2014, and its failure to do so rendered its 2013 financial reports materially false and misleading.

215. In December 2014, Valeant entered into the purchase option agreement with Philidor, which required Valeant to consolidate Philidor's financials. However, Valeant still failed to disclose Philidor as a material consolidated VIE prior to October 2015.

216. Specifically, on February 25, 2015, Valeant filed its annual report on Form 10-K for the year ended December 31, 2014 ("2014 10-K"). The 2014 10-K was signed by Pearson and Schiller. Valeant, Pearson and Schiller again represented that the audited financial statements included therein were "prepared in accordance with U.S. generally accepted accounting principles." In Note 2 to its Consolidated Financial Statements – entitled "Significant Accounting Policies" – Valeant, Pearson and Schiller represented that, "[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ("VIEs") for which the Company is the primary beneficiary." In Note 3 to its Consolidated Financial Statements – entitled "Business Combinations" – Valeant, Pearson and Schiller represented that, "[d]uring the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate." The 2014 10-K contained no references to Philidor.

217. These statements, which caused Valeant securities to trade at artificially inflated prices, were materially false, misleading and incomplete because the fact that Philidor was a material consolidated VIE required Defendants to disclose certain information about Philidor pursuant to ASC 810. Specifically, Valeant was required to disclose, among other things, quantitative and qualitative information about Valeant's ties to Philidor, including the "nature, purpose, size and activities" of Philidor, and how Philidor was financed. *See* ASC 810-10-50-5A. Additionally, Valeant was required under U.S. GAAP to disclose the factors that resulted in

the consolidation of Philidor – *i.e.*, the purchase option agreement with Philidor.  *See id.*
Moreover, Valeant was required to disclose information concerning:  (a) significant judgments
and assumptions made in determining whether it needed to consolidate Philidor and/or disclose
information about its involvement with Philidor; (b) the "nature of, and changes in, the risks
associated with" Valeant's involvement with Philidor; and (c) how Valeant's involvement with
Philidor affected Valeant's "financial position, financial performance and cash flows."  *See* ASC
810-10-50-8.

218.    Furthermore, Valeant's 2014 10-K contained an MD&A section.   However,
Valeant failed to disclose Philidor as a distinct sales channel in that report.  The MD&A in
Valeant's 2014 10-K, which caused Valeant securities to trade at artificially inflated prices, was
materially misleading and incomplete because, under SAB Topic 13, Valeant had an obligation
to disclose Philidor as a distinct sales channel in its MD&A.  Specifically, Valeant was required
to disclose Philidor as a "[c]hanging trend[] in shipments into . . . a sales channel . . . that could
be expected to have a significant effect on future sales or sale returns."  SAB Topic 13.B.  By the
third quarter of 2015, sales through Philidor were accounting for at least approximately 7% of
Valeant's revenues and likely far more given the substantial declines in Valeant's revenues
following Philidor's closure.  Thus, Valeant was required to disclose its use of Philidor as a
changing trend in a sales channel that was expected to have a significant effect on Valeant's
sales.

## II.   SUMMARY OF DEFENDANTS' NEGLIGENCE

219.   Had Pearson acted with the standard of care required of a CEO of a public company, and had Schiller acted with the standard of care required of a CFO of a public company, they would have been aware that Philidor was effectively a division of Valeant whose sole purpose was to steer patients toward Valeant products even when much cheaper generic alternatives were available, that Philidor was a material VIE, and that Valeant was required to disclose certain information about Philidor in its periodic reports filed with the SEC between 2013 and 2015.

220.   In failing to exercise the care required of a CEO of a public company, Pearson was negligent in making materially false and misleading statements and omissions of material facts, and acted in bad faith, concerning Philidor.

221.   In failing to exercise the care required of a CFO of a public company, Schiller was negligent in making materially false and misleading statements and omissions of material facts, and acted in bad faith, concerning Philidor.

222.   Given the positions as the most senior executives of Valeant, Pearson's and Schiller's negligence is imputable to Valeant.

## III.   PLAINTIFFS' ACTUAL RELIANCE

223.   During the relevant period, Plaintiffs were managed by their investment advisor, MSD Partners.   MSD Partners made the investment decisions with respect to Plaintiffs' purchases of Valeant securities.   Factors considered by MSD Partners in making such decisions included, among other things, Valeant's financial performance and a review of the Company's strengths, weaknesses and opportunities.

224.   Prior to making the decision to purchase Valeant securities, an investment analyst at MSD Partners actually read, reviewed and relied upon Valeant's 2013 10-K, including

Defendants' statement that, "[t]here were no material arrangements determined to be variable interest entities."

225.    Prior to making the decision to purchase Valeant securities, an investment analyst at MSD Partners actually read, reviewed and relied upon Valeant's 2014 10-K, including Defendants' statements that:  (a) "[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ("VIEs") for which the Company is the primary beneficiary"; and (b) "[d]uring the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate."

226.    Defendants' statements concerning the absence of any material VIEs were material to MSD Partners' decision to purchase Valeant securities on Plaintiffs' behalf.  If Valeant had a relationship with VIE that was material to Valeant's business, such as Philidor, it was important for Valeant to disclose certain information about that VIE.  Without such information, MSD Partners could not accurately assess the impact of the VIE on Valeant's operations, performance and opportunities.

227.    The investment analyst at MSD Partners actually relied upon information contained in Valeant's 2013 10-K and 2014 10-K (to the extent each such document was on file with the SEC at the time) in making each purchase set forth on Exhibits A through B on behalf of Plaintiffs.

## IV.    LOSS CAUSATION

228.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  During the time that Plaintiffs purchased Valeant common stock, set forth in Exhibits A through B, the market price of those securities was artificially inflated as a direct result of Defendants' materially false and misleading statements

and omissions of material facts.  As a series of partial but inadequate disclosures was issued correcting the prior false and misleading statements, as detailed above in paragraphs 97 through 109, the price of those securities declined precipitously, and Plaintiffs were damaged.

229.   Defendants concealed the existence of Philidor and Valeant's relationship to Philidor.  In doing so, they concealed the foreseeable risk to Valeant's business if market participants discovered the true nature of the relationship between Valeant and Philidor (*i.e.*, that Philidor effectively was a division of Valeant) and that Valeant, through Philidor, had created an entire network of phantom captive pharmacies that Valeant was using to peddle its products. Beginning with the October 19, 2015 partial disclosure of Philidor by Valeant, that foreseeable risk gradually materialized, thus causing the price of Valeant securities to decline as detailed above.

## V.   <u>NO SAFE HARBOR</u>

230.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

VI.     NEGLIGENCE-BASED CAUSES OF ACTION

THIRD CAUSE OF ACTION

Violations of Section 18 of the Exchange Act
Against All Defendants

231.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 210 through 230 above as if set forth herein.  As to this Cause of Action, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct.

232.    As alleged herein, Defendants caused (at least negligently) statements to be made in Valeant's 2013 10-K, including statements concerning the lack of any material variable interest entities, which statements were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

233.    As alleged herein, Defendants caused (at least negligently) statements to be made in Valeant's 2014 10-K, including statements concerning the immateriality of any consolidated variable interest entities and acquisitions, which statements were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

234.    In purchasing Valeant's, Plaintiffs' investment team actually read, and had direct eyeball reliance on, Valeant's 2013 10-K and 2014 10-K.

235.    Specifically, an investment analyst at MSD Partners read and actually relied upon information contained in Valeant's 2013 10-K and 2014 10-K (to the extent each such document was on file with the SEC at the time) in making each purchase set forth on Exhibits A through B on behalf of Plaintiffs, as further described above in paragraphs 223 through 227.

236.    In ignorance of the falsity of Defendants' statements and omissions, or of the true facts, Plaintiffs purchased Valeant securities in actual, eyeball reliance upon Defendants' representations.

237.     Defendants' materially false and misleading statements and omissions of material fact artificially inflated the price of Valeant common stock.

238.     Had they known the true facts, Plaintiffs would not have purchased the Valeant securities and/or would not have purchased them at the inflated prices they paid.

239.     Upon disclosure of the true facts, the price of Valeant securities dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

240.     By reason of the foregoing, Defendants Valeant, Pearson and Schiller are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78*r*.

241.     Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the accrual of this cause of action.  Consequently, this action is timely.

### FOURTH CAUSE OF ACTION

**Negligent Misrepresentation
Against All Defendants**

242.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 210 through 241 above as if set forth herein.  As to this Cause of Action, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct.

243.     Defendants Valeant, Pearson and Schiller authorized or caused the representations and/or omissions set forth above in paragraphs 211 through 218.

244.     These Defendants supplied false information for use by Plaintiffs in making an investment decision.

245.     Defendants Valeant, Pearson and Schiller made misrepresentations that they knew, or should have known, to be false in order to induce Plaintiffs to purchase Valeant securities.

246.   Defendants Valeant, Pearson and Schiller breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

247.   Moreover, Defendants had a duty to disclose certain information concerning Philidor.  Defendants Valeant, Pearson and Schiller breached that duty by failing to disclose such information.

248.   Plaintiffs reasonably relied on the information Defendants Valeant, Pearson and Schiller provided and were damaged as a result of these misrepresentations and omissions. Plaintiffs would not have purchased Valeant securities at all, or at the inflated prices they paid, had they known the true facts regarding, *inter alia*, Philidor.

249.   By reason of the foregoing, Defendants are liable to Plaintiffs for negligent misrepresentation.

250.   As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)     Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)     Awarding Plaintiffs their reasonable costs and expenses incurred in this action; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: October 14, 2016

**LOWENSTEIN SANDLER LLP**

By:     s/ Lawrence M. Rolnick
        Lawrence M. Rolnick
        Marc B. Kramer
        Thomas E. Redburn, Jr.
        Sheila A. Sadighi
        Michael J. Hampson
        65 Livingston Avenue
        Roseland, NJ  07068
        Tel. 973.597.2500
        Fax  973.597.2400
        lrolnick@lowenstein.com
        mkramer@lowenstein.com
        tredburn@lowenstein.com
        ssadighi@lowenstein.com
        mhampson@lowenstein.com

*Counsel for Plaintiffs*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

I certify under penalty of perjury that the forgoing is true and correct.  Executed on this 14th day of October 2016.

**LOWENSTEIN SANDLER LLP**

By:   <u>s/ Lawrence M. Rolnick</u>
Lawrence M. Rolnick